| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| **FERRO LABELLA & WEISS L.L.C.**<br>Peter J. Gallagher<br>The Landmark Building<br>27 Warren Street<br>Hackensack, New Jersey 07601<br>(201) 489-9110<br>pgallagher@ferrolabella.com<br>Attorneys for Interpool, Inc. d/b/a TRAC Intermodal | |
| In Re:<br><br>EAGLE ROADWAYS, INC.,<br><br>Debtor. | Case No.: 21-10174 MBK<br>Chapter: 11<br>Judge: Hon. Michael B. Kaplan |

**OPPOSITION TO DEBTOR'S MOTION TO COMPEL CHASE BANK TO CLOSE ACCOUNT AND CROSS-MOTION OF INTERPOOL, INC. D/B/A TRAC INTERMODAL FOR AN ORDER DISMISSING THE CASE AS A BAD FAITH FILING.**

Interpool, Inc. d/b/a TRAC Intermodal ("TRAC") submits this opposition to the Motion to Compel Chase Bank to Close Account, filed by Debtor Eagle Roadways, Inc. ("Eagle") (ECF #20), and cross moves for an order dismissing Eagle's Chapter 11 petition as a bad faith filing under 11 U.S.C. §1112(b). In support of its opposition and cross-motion, TRAC submits the Certification of Karen Wolcott (the "Wolcott Certification") and states as follows:

**Preliminary Statement**

The only reason Eagle filed for bankruptcy was to prevent TRAC from collecting on a judgment it obtained against Eagle in state court. Eagle has already admitted as much in this case. And as if that alone would not justify dismissal of

this petition as a bad faith filing, Eagle has also acknowledged that its petition was inaccurate in several misleading and material aspects, including by failing to identify preference payments and payments to insiders. Eagle was advised of these shortcomings during the 341 Meeting, and ordered by the Trustee to amend its petition accordingly. Yet to date, more than one month after the 341 Meeting, none of these material inaccuracies have been corrected. Eagle's lack of candor with the Court, in this regard, and in other ways discussed more fully below, is further evidence of bad faith and further justifies dismissing Eagle's petition.

## Background

1. TRAC is America's second largest marine chassis pool manager and marine container chassis provider. *See* Certification of Karen Wolcott (the "Wolcott Certification"), ¶2. Among other things, TRAC rents and leases marine container chassis to its customers under both long-term and short-term rental agreements. *Id*. Eagle is one of TRAC's customers. TRAC and Eagle entered into several agreements, each of which Eagle breached as described below. *Id*.

2. On December 21, 2015, Eagle entered into an Equipment Interchange Agreement for Marine Chassis Pools (the "Daily Rental Agreement"). *Id*. at ¶3. A copy of the Daily Rental Agreement is attached as Exhibit A to the Wolcott Certification.

3. Under the Daily Rental Agreement, TRAC agreed to provide Eagle, upon request and subject to availability, with marine container chassis from various

TRAC depots ("pools") located within and adjacent to the Ports of New York and New Jersey. *Id.* at ¶4.

4. For each day, or portion thereof, that Eagle leased a chassis under the Daily Rental Agreement, Eagle was required to pay the per diem rate applicable when the chassis was on hired. *Id.* at ¶5. Eagle was also required to pay for any damage to the chassis as well as tickets or citations issued to a chassis while rented to Eagle. *Id.*

5. On July 1, 2017, Eagle also entered into a Chassis Lease Agreement ("Lease Agreement") with TRAC. *Id.* at ¶6. The Chassis Lease Agreement was later amended on September 25, 2017. Copies of the Lease Agreement and the Amendment are attached as Exhibit B to the Wolcott Certification.

6. Under the Lease Agreement, Eagle originally leased "three (3) 23' foot slider style chassis, seven (7) 40'/45' extendable style chassis and one (1) 40' gooseneck style chassis," and had the ability to add "additional chassis taken on hire." *Id.* at ¶7. All told, Eagle leased 22 chassis under the Lease Agreement. *Id.*

7. Unlike any chassis rented under the Daily Rental Agreement, Eagle was not required to pick up and drop off this chassis at one of TRAC's depot locations on a daily basis, but could instead keep the chassis in its possession for the duration of the Lease Agreement. *Id.* at ¶8.

8. Under the Lease Agreement, the Lease Rate was $7.50 per chassis, per day for the 23' slider chassis and 40'/45' extendable chassis. *Id.* at ¶9. The Lease Rate was $5 per chassis, per day for the 40' gooseneck chassis. *Id.*

3

9. Notwithstanding its obligations under the Daily Rental Agreement and the Lease Agreement, Eagle failed to pay invoices when due. *Id.* at ¶10.

10. On September 27, 2019, TRAC, through its counsel, sent a demand letter to Eagle for the amounts then due under the Daily Rental Agreement and the Lease Agreement. *Id.* at ¶11. One month later, TRAC, agai through its counsel, followed up with a second letter requesting that Eagle contact TRAC to resolve its debt. *Id.* Eagle never responded to either letter. *Id.*

11. Accordingly, TRAC sued Eagle in the Supreme Court of New Jersey, Middlesex County, in a matter captioned, *Interpool, Inc. d/b/a TRAC Intermodal*, MID-L-7466-19 (the "State Court Litigation"). *Id.* at ¶12. The complaint, like all subsequent correspondence and pleadings was sent to Eagle's registered agent for service. *Id.*

12. Eagle never answered the complaint in the State Court Litigation, therefore default was entered against it on January 24, 2020 and final judgment by default was entered against it on February 12, 2020. *Id.* at ¶13. Eagle never moved to set aside the entry of default or vacate default judgment. *Id.*

13. On October 22, 2020, TRAC moved to amend the Order for Default Judgment to include all attorney's fees and expenses it incurred in the State Court Litigation. *Id.* at ¶14. On November 13. 2020, the Court entered an Amended Order for Default Judgment (the "State Court Judgment"). *Id.* Eagle never opposed the motion to amend the judgment or moved to set aside the judgment. *Id.*

14. On December 10, 2020, the Court issued a Writ of Execution to the Middlesex County Sheriff, commanding the Sheriff to satisfy TRAC's judgment out of Eagle's property located in Middlesex County. *Id.* at ¶15.

15. On December 21, 2020, the Middlesex County Sheriff's Office served the Writ of Execution on Chase Bank, and levied on funds belonging to Eagle at that institution in the amount of $51,985.72 (the "Chase Account"). *Id.* at ¶16.

16. On December 22, 2020, the Middlesex County Sheriff provided notice to Eagle of the levy on its funds. *Id.* at 17. Shortly thereafter, Bhupinder Singh, who is believed to be the sole member of Eagle, contacted TRAC's counsel, for the first time, to discuss Eagle's debts to TRAC. *Id.*

17. The State Court Judgment does not cover all of the money owed by Eagle to TRAC. *Id.* at ¶18. The State Court Judgment covers invoices through the end of 2019 and the beginning of 2020. *Id.* Eagle continued to take TRAC's chassis under the Daily Rental Agreement throughout 2020, without paying for usage. *Id.* This resulted in an additional debt of $41,874.29 by Eagle. *Id.* And even this does not accurately quantify Eagle's debt to TRAC, as Eagle's usage of TRAC's chassis has increased in the months since Eagle filed for bankruptcy. *Id.* In January and February of 2021, Eagle has incurred rental charges of almost $30,000 for its use of TRAC's chassis. *Id.*

18. Finally, TRAC is not able to prevent Eagle from taking TRAC's pool chassis under the Daily Rental Agreement. *Id.* at ¶20. Chassis from TRAC's pool fleets at the major marine and rail terminals within the Ports of New York and New

Jersey can be used by any motor carrier, including Eagle, that: (a) enters into a Daily Rental Agreement with TRAC; and (b) has ocean carrier or Port Authority clearance to enter the marine and rail terminals to pick up shipping containers. *Id.*

19. When a motor carrier arrives at a marine or rail terminal gate to pick up a shipping container, the terminal's security personnel only check to ensure that the motor carrier is authorized to pick up shipping containers at the terminal. *Id.* at ¶21. Once inside the terminal, the motor carrier is directed by the terminal's personnel to the location where a shipping container is already loaded (or "mounted") on the TRAC pool chassis. *Id.* The motor carrier then passes through the terminal's gate exit check point again on the way out of the terminal. *Id.* While the motor carrier must stop at the terminal's entry and exit check points, security personnel only verify that the motor carrier is authorized to transport the shipping container, not the chassis, from the terminal. *Id.*

20. The terminal's security personnel never check to see if the motor carrier is authorized to use a TRAC pool chassis. *Id.* at ¶22. The terminal's objective is getting the goods or freight in the shipping container out of the terminal and on the road for delivery. *Id.* The terminals take the position that a second "check" by their gate security into whether the motor carrier is permitted to use the chassis would, among other things, delay the delivery of essential goods in the shipping container, thus disrupting the U.S. supply chain. *Id.*

21. TRAC is not permitted to station employees at the terminals to police which motor carriers take its chassis from its chassis pool fleets. *Id.* at ¶23.

Therefore, TRAC is unable to prevent Eagle from using TRAC's pool chassis – usage which continues to this day – to haul shipping containers, even though TRAC has not been paid by Eagle for Eagle's chassis rentals in more than three years. *Id.*

## Jurisdiction, Venue, and Statutory Basis

22. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Application is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought is Section 1112 of the Bankruptcy Code.

## Argument

### I. Eagle's bankruptcy petition should be dismissed because it was filed in bad faith.

23. Bankruptcy petitions are subject to dismissal for "cause" under Section 1112(b) "unless filed in good faith, and the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004). Courts in this jurisdiction have found that "cause" exists when a petition is filed in bad faith. *E.g.*, *In re Walden Ridge Development, LLC*, 292 B.R. 58, 62 (Bankr. D.N.J. 2003) ("It is well established that a debtor's bad faith filing of a bankruptcy petition is sufficient "cause" to warrant dismissal of a case under §1112(b).").

24. Here, Eagle's petition was filed in bad faith because: (1) it was filed for the improper purpose of obtaining an advantage in the State Court Litigation; and (2) Eagle has demonstrated a lack of candor to the Court and the Trustee in its

7

petition and sworn testimony during the 341 Meeting. Accordingly, Eagle's petition should be dismissed.

25. "Filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of bankruptcy laws." *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 625 (3d Cir., 2009) (citation omitted). So, "[w]here the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." *Id.* (citation omitted).

26. Here, Eagle admits that its primary, if not sole, purpose for filing its bankruptcy petition was tactical. During the 341 Meeting, Mr. Singh repeatedly emphasized that Eagle filed for bankruptcy to release the lien TRAC obtained on one of Eagle's bank accounts, and thus prevent TRAC from collecting its State Court Judgment:

> Q. And why did the debtor file Chapter 11?
>
> A. Ma'am, because . . . TRAC Intermodal they put the levy on the (indiscernible) so that messed up my accounts so, you know, that's why I (indiscernible) my business so that's why we filed this Chapter 11.
>
> Q. I'm not understanding you. Can you speak slower and just explain to me why you filed?
>
> A. Because, Ma'am, the TRAC Intermodal, Interpool –
>
> Q. The what?
>
> A. They put the levy on the -- the TRAC Interpool.
>
> Q. The TRAC Interpool?

8

> A. Yes, Ma'am. They put the levy on our account. So they holding our funds so that's the reason I'm filing, you know, because hard time to getting the money, you know. The last thing I want (indiscernible) keep running the business, you know.
>
> Q. So a creditor put a levy on the debtor's bank accounts; is that correct?
>
> A. Yes, Ma'am, yeah.

*See* Certification of Counsel, Exhibit A, Transcript of 341 Meeting, 11:13-12:10; *see also id.* at 37:15-19 ("Q. Mr. Singh, number six asks you if there's any bank that has set off or seized a bank account. That's why you filed this bankruptcy; right? A. Yes, Ma'am.").

27. And its conduct in the State Court Litigation only proves the point. Eagle ignored every document served on it through its registered agent. *See* Wolcott Certification, ¶¶ 12-17. Eagle never responded to TRAC's: demand letter; complaint; request for entry of default; request for final judgment by default; request for writ of execution; motion to amend final judgment; and request for amended writ of execution. *Id.* Eagle never participated in the litigation, or even contacted Eagle to attempt to resolve its debt to TRAC, until TRAC levied the Chase Account. *Id.*

28. As the U.S. Supreme Court noted: "By seeking discharge [through bankruptcy] . . . the [debtor] placed the rectitude of its prior dealings squarely in issue, for, as the Court noted, the Act limits that opportunity to the honest but unfortunate debtor." *Brown v. Felson*, 442 U.S. 127, 128 (1979). Here, Eagle's prior dealings show that it is not honest but unfortunate, and instead that it fully

9

intended to ignore its financial obligations to TRAC until TRAC levied the Chase Account. As such, its bankruptcy petition was entirely tactical, designed solely to avoid paying its debt to TRAC, and must be dismissed.

29. That Eagle filed for bankruptcy to avoid paying TRAC also reveals this case to be a two-party dispute, which does not belong in this Court. "Generally, where a debtor's reorganization effort involves essentially a two-party dispute that is resolvable in state court, dismissal for 'cause' is warranted." *In re Shar*, 253 B.R. 621, 636 (Bankr. D.N.J. 1999) (collecting cases). Eagle filed for bankruptcy to delay the State Court Litigation. Accordingly, its petition was filed in bad faith and should be dismissed.

30. Eagle's lack of candor to the Court and the Trustee also provides "cause" to dismiss its petition. A lack of candor in dealing with the Court, through nondisclosure or misrepresentation is a condition courts weigh heavily when considering dismissal for bad faith under Section 1112(b). *E.g.*, *In re Rognstad*, 121 B.R. 45, 50 (Bankr. D. Hawaii 1990) ("An important factor in determining the existence of bad faith is whether the Debtors have misrepresented material facts. The finding of bad faith may rest on such nondisclosure or misrepresentation and even subsequent amendments do not vitiate bad faith in failing to disclose relevant facts."). Good faith "permeates virtually every aspect of a bankruptcy case," from filing of the petition through confirmation of the plan. *In re Kollar*, 357 B.R. 657, 661 (Bankr. M.D. Fla. 2006). "The protections and forgiveness inherent in the

bankruptcy laws surely require conduct consistent with [these] concepts of basic honesty." *Id.* (citing *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986).

31. During the 341 Meeting, Eagle admitted that several portions of its petition were inaccurate. The Trustee ordered Eagle to amend its petition to correct these deficiencies. Eagle has not done so. Eagle's lack of candor in its petition, and its failure to promptly amend its petition in the face of the Trustee's order each demonstrate bad faith justifying the dismissal of its petition.

32. Notably, the deficiencies in Eagle's petition were not minor or administrative. Eagle's petition was deficient in several material aspects. For example:

- On Form 206D, Eagle did not list the various factoring companies who are creditors in this case as secured creditors. Somewhat remarkably, Eagle claimed that these creditors might not be secured. *See* Certification of Counsel, Exhibit A, Transcript of 341 Meeting, 26:12-27:17.

- Eagle failed to provide the dates on which the various debts identified in Form 206E accrued.

- In response to Question 3 on Form 207, Eagle claimed that it made no payments or transfers to creditors within 90 days of filing its petition. During the 341 Meeting, Mr. Singh admitted that this was false and that Eagle had made such payments. *Id.* at 34:4-16.

- In response to Question 4 on Form 207, Eagle claimed that it made no payments or transfers of property made within one year of filing its petition. During the 341 Meeting, Mr. Singh admitted that this was false and that Eagle had made such payments. *Id.* at 34:14-36:10.

- In response to Question 6 on Form 207, Eagle claimed that no bank had set off or seized any of its bank accounts. During the 341 Meeting, Mr. Singh admitted that this was false and that the lien placed on the Chase Account was the reason it filed for bankruptcy. *Id.* at 37:15-21.

11

- In response to Question 26 on Form 207, Eagle indicated that it had no books and records. During the 341 Meeting, Mr. Singh admitted that this was false and that Eagle's accountant had all of its books and records. *Id.* at 39:22-40:12.

- In response to Question 28 and 29 on Form 207, Eagle identified no directors, officers, or partners. During the 341 Meeting, Mr. Singh admitted that this was false and that he is Eagle's only officer. *Id.* at 40:13-22.

- In response to Question 30 on Form 207, Eagle claimed that it made no payments or distributions to insiders within one year of filing its petition. During the 341 Meeting, Mr. Singh admitted that this was false and that Eagle had made such payments. *Id.* at 40:23-41:9.

33. These omissions were so glaring that the Trustee admonished Eagle's counsel during the 341 Meeting. *Id.* at 36:12-37:14. The Trustee noted that certain entries in the petition were false – or, at the very least, completed "carelessly" – and that the petition could be subject to dismissal as a result. *Id.* Yet in the face of this warning, Eagle has still failed to amend its petition.

34. Mr. Singh also demonstrated a lack of candor when describing Eagle's relationship with TRAC. Mr. Singh testified that Eagle had not leased a chassis from TRAC in three years. *Id.* at 49:7-17. Not true. Eagle regularly leased chassis from TRAC under its Daily Rental Agreement in 2019, 2020, and even into 2021. *See* Wolcott Certification, ¶18. In fact, Eagle's use of TRAC's chassis **increased** in the weeks leading up to Eagle's bankruptcy petition, and has remained high post petition. *Id.* Yet, just as it did pre-petition, Eagle has not paid TRAC for its post-petition use of TRAC's chassis. *Id.*

35. TRAC cannot prevent Eagle from taking chassis from the pools at the marine terminals. *See* Wolcott Certification, ¶¶ 20-23. Eagle knows this, and knows

12

that it will not have to pay for its use of these chassis as long as its bankruptcy case is pending. Eagle should not be allowed to game the system in this manner. Eagle's bankruptcy petition was filed in bad faith. Eagle's lack of candor to the Trustee and the Court proves as much. For this reason, and the other reasons discussed above, Eagle's petition should be dismissed.

## II. Debtor's motion is procedurally improper. Its request to release the lien on the Chase Account must be made in an adversary proceeding.

36. In a recent unanimous decision, the U.S. Supreme Court held that a creditor's retention of estate property after the filing of a bankruptcy petition does not violate Section 362(a)(3). <u>City of Chicago v. Fulton</u>, 141 S. Ct. 585 (2021). In its decision, the Supreme Court also clarified that the debtor must bring an adversary proceeding under Section 542 to compel the creditor to return the property.

37. The Supreme Court's decision in <u>Fulton</u> is consistent with Third Circuit precedent holding that turnover under Section 542 is neither automatic nor self-effectuating. <u>In re Denby-Peterson</u>, 941 F.3d 115, 129 (3d Cir. 2019). In <u>Denby-Peterson</u>, debtor argued that the use of the word "shall" in Section 542(a) – "an entity, other than a custodian, in possession, custody, or control . . . of property that the trustee may use . . . **shall** deliver to the trustee, and account for, such property" – made turnover mandatory and automatic. The Third Circuit rejected this argument:

> [T]urnover is mandatory only in the context of an adversary proceeding presided over by the Bankruptcy Court. Under Rule 7001(1), the debtor must bring an adversary proceeding seeking turnover. True, the

13

> turnover provision states: "shall deliver," but the question before us is when must a creditor deliver? The answer is when the Bankruptcy Court says so in the context of an adversary proceeding brought under Rule 7001(1)

Id. at 131. In light of this clear precedent, Eagle must file an adversary proceeding to compel the release of the lien on the Chase Account.

38.    Compelling Eagle to file an adversary proceeding will also allow the Court to better evaluate its request. Eagle's motion contains a cursory statement that the monies in the account are "needed to reorganize the company," but provides no details. It is not clear from the threadbare motion whether the money belongs to Eagle in the first place and whether it is actually needed "to reorganize the company." The two monthly reports submitted by Eagle thus far suggest it is not needed. Both show positive cash flow and more than $200,000 in receivables, but neither identifies from whom these receivables are owed, explains whether the receivables are collectible, or provides any further detail about these monies. In fact, neither report contains any exhibits that explain the source of any of Eagle's revenue. Additional information is necessary to evaluate Eagle's request to release the lien, and this information is best discovered through an adversary proceeding.

## Conclusion

**WHEREFORE**, TRAC requests the entry of an order (a) dismissing Eagle's bankruptcy petition as a bad faith filing, together with such other and further relief the Court deems just and proper; or (b) denying Eagle's motion to lift the levy on the Chase Account, together with such other and further relief the Court deems just and proper.

                **FERRO LABELLA & WEISS L.L.C.**
                Attorneys for Interpool, Inc. d/b/a TRAC Intermodal

Dated: March 10, 2021    By:   s/Peter J. Gallagher
                                        Peter J. Gallagher